UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

* * * * * * * * * * * * * * * * * * *

FINDINGS OF FACT, CONCLUSIONS OF LAW
AND ORDER FOR ENTRY OF JUDGMENT

* * * * * * * * * * * * * * * * * * *

United States of America,

Plaintiff,

vs.

Douglas R. Askegard, individually and as personal representative of the Estate of Gladys M. Askegard; David Askegard; Wayne Aslesen; Aileen Askegard Clough, individually and as trustee of the Clough Family Trust and John Doe, Trustee of the Clough Family Trust,

Defendants. Civ. No. 01-845 (RLE)

* * * * * * * * * * * * * * * * * * *

I. Introduction

This matter came before the undersigned United States Magistrate Judge pursuant to the consent of the parties, as authorized by the provisions of Title 28 U.S.C. §636(c). The Court Trial of this action commenced, and was completed, on

February 10, 2004. Thereafter, the parties submitted post-Trial briefs, with the last such brief having been filed with the Court on April 6, 2004, at which time, the matter was taken under advisement. At the time of Trial, the Government appeared by Mary E. Bielefeld, Trial Attorney, Tax Division, United States Department of Justice; and the Defendants appeared by Jon J. Jensen, and Daniel L. Gaustad, Esqs.

This action centers on the Government's effort to collect Estate Taxes on a closely held business -- a farm -- following the death of Gladys M. Askegard. The Defendants contend that the applicable statute of limitations precludes what they characterize as the Government's belated attempt at collection. In contrast, the Government urges that the pertinent statute of limitations had not fully run by the time that this action was commenced on May 16, 2001.

Based upon the entirety of the Record before us, the files, Exhibits, and argument of counsel, and being fully advised in the premises, we now make our Findings of Fact, and Conclusions of Law, as follows:

## II. Findings of Fact

1. Gladys M. Askegard died on February 1, 1981. Thereafter, in March of 1981, Douglas R. Askegard ("Askegard") was appointed as the Personal Representative of Gladys' Estate, and he held that position at all relevant times. As

the Estate's Personal Representative, Askegard filed an Estate Tax Return on April 19, 1982, together with an election, under Title 26 U.S.C. §6166, to defer payment of the Estate Tax due on the Estate's family farm, which was a closely held business. See, Plaintiff's Exhibit 22.[1] "Section 6166 allows the [Personal Representative] of an estate to pay all or part of the estate tax in up to ten equal installments if over 35 percent of the adjusted gross value of the estate is comprised of an interest in a closely held business." Estate of Bell v. C.I.R., 928 F.2d 901, 902 (9th Cir. 1991), citing Title 26 U.S.C. §6166(a)(1); see also, Lake Shore Nat'l Bank v. Coyle, 419 F.2d 958, 962 (7th Cir. 1969). "The purpose of section 6166 is to prevent the forced liquidation of closely held businesses because substantial estate taxes must be paid" and, "[t]o further th[at] purpose, Congress allows certain estates involving closely held businesses to elect to defer payment of the estate tax up to five years and to make payments in ten annual installments." Id., citing Title 26 U.S.C. §6166(a). As a consequence, "[i]f a taxpayer-estate has elected to defer the payment of taxes under section 6166, and has taken advantage of the maximum period of deferral, it would not

[1]The only exhibits offered, or admitted at Trial, were those of the Plaintiff, and therefore, for ease of reference we simply refer to the Exhibits by number.

have to fully pay its taxes for 15 years." Hansen v. United States, 248 F.3d 761, 764 (8th Cir. 2001).

2. In addition, the Estate, through Askegard, elected the benefits of a special use valuation, pursuant to Title 26 U.S.C. §2032A, see Exhibit 23, for three parcels of the farmland which were located in Clay and Wilkin Counties. "As a general rule, when a person dies, all property left to his or her estate is valued, and the Estate Tax is computed, on the basis of the fair market value of that property." United States v. Askegard, 291 F. Supp.2d 971, 975 n. 2 (D. Minn. 2003); see also, Estate of Gibbs v. United States, 161 F.3d 242, 245 (3rd Cir. 1998). "However, for farms, or closely-held business realty of the estate, a special-use valuation may be used, which allows the estate to value such land on the basis of its value as a farm, or as a closely held business, rather than at its best use value." Id.; see also, Estate of Gavin v. United States, 113 F.3d 802, 805-06 (8th Cir. 1997)("Valuing real property at its actual use will often substantially reduce an estate's tax burden."). "[Section 2032A] was intended to grant relief to the heirs of family farms who might otherwise find that valuation of inherited farmland at its fair market value would result in such large estate taxes that they would be required to sell the farm in order to pay the tax." Estate of Gibbs v. United States, supra at 245, citing H.R. Rep. No. 94-1380, at 21-22 (1976), reprinted

in 1976 U.S.C.C.A.N. 3356, 3375-76. "By allowing this 'special use' valuation, §2032A is designed to encourage the continuation of family farms and other closely-held businesses." Id.

3. The Internal Revenue Service ("IRS") approved the elections made by the Estate and, together with the Estate's Return, Askegard remitted $18,023.23 to pay the principal and interest due on that portion of the Estate Tax which was not entitled to the Section 6166 deferral. See, Exhibit 53 at ¶17; Exhibit 54 at ¶14. A delegate of the Secretary of the Treasury accepted the Section 6166 election, and then, on June 21, 1982, made an assessment against the Estate for Federal Estate Taxes in the amount of $215,572.28. See, Exhibit 53 at ¶19; Exhibit 54 at ¶15; Exhibit 16 at p. 2. "Thereafter, following an audit of Askegard's Return, on April 2, 1984, some additional taxes were assessed against the Estate," and the "[c]ollection of those taxes was also tolled by the Estate's Section 6166 election." United States v. Askegard, supra at 975; see also, Exhibit 16 at p. 2 (reflecting that an additional $67,467.06 in estate taxes was assessed as of March 7, 1984, see Exhibit 2, at unnumbered p. 4). As a result of the IRS's acceptance of the Estate's Section 6166 election, the first annual installment of the Estate's deferred tax was due on November 1, 1986.

4. As noted, three parcels of the Estate's real estate were pledged as security for the deferred payments, and for the special use valuation. See, Exhibits 22 and 23. As a consequence, Federal Estate Tax Liens were placed upon the three parcels arising from the special use valuations. See, Exhibit 17. One of the parcels was located in Wilkin County, and the other two were located in Clay County, Minnesota. Id. Although varyingly described in this Record, the three parcels were identified, in the Estate's Tax Return, as Lots 2, 10, and 11. See, Exhibit 1 at pp. 4-5; see also, Exhibit 17 at pp. 2-3.

5. After the IRS audit, the value of the Estate's real property, which comprised the closely-held business, was adjusted from $829,548.00, to $945,473.00, and that valuation was agreed upon by the Estate. See, Exhibit 51. However, the Estate's closely-held business also owned machinery, in the amount of $54,445.00. When added to the value of the real property held by the Estate, the Estate's closely-held business had an agreed audit value of $999,918.00, at the time of Gladys' death. Id. As of that same date, the value of the pledged Lots were as follows:

| | |
|---|---|
| Lot 2 | $168,415.00 |
| Lot 10 | $155,812.00 |
| Lot 11 | $160,184.00 |

Id.; see also, Exhibit 2, Form 886-A, at p. 3.

Those valuations[2] have particular significance to the Defendants' claim that, as of no later than February of 1990, more than one-third of the value of the Estate's closely-held business had been sold, such as would trigger the running of the statute of limitations, under Title 26 U.S.C. §6166(g)(1)(A)(i).

6. "As part of the Section 6166 election, Askegard, as the Estate's Personal Representative, was required to complete, sign, and return to the IRS, together with the annual interest payments, a certification form, which advises the IRS of any changes in his address, and certifies the status of the Estate." United States v. Askegard, supra at 975. According to the Record presented, Askegard completed only one annual certification, which is dated October 11, 1983, and which certifies that no changes had occurred in the status of the Estate, but that Askegard had a change of residential address. See, Exhibit 25 at p. 2. No other changes in either Askegard's address, or the status of the Estate, were certified by Askegard, notwithstanding Askegard's testimony that, since 1981, he had "moved at least seven times," and has resided in three different States -- Minnesota, Texas, and California. Trial Transcript ("Tr.") at 172. The absence of such certifications, over the substantial period of time

[2]The Defendants do not quarrel with these valuations. See, Defendants' Post-Trial Brief, at p. 4.

at issue here, is enigmatic. Marsene Patterson ("Patterson"), who serves as a Tax Examiner at the Internal Revenue Service Center in Ogden, Utah, testified that, if a certification had not been received over a period of two years, and letters and telephone calls did not prompt a response, then a representative of the IRS, out in the field, would attempt to determine why a certification had not been received. Tr. at 134.[3] Patterson also related, without objection, that the failure to file certifications would not result in a default of the Estate's account. Id.

7. The Record demonstrates that the holdings of the Estate had changed substantially during Askegard's tenure as its Representative. In fact, even before the start of that tenure, Askegard received certain real estate, that otherwise would have remained in the Estate, in exchange for a Promissory Note from Askegard, and his wife Darla Jo, in the principal sum of $150,000.00, with interest at six (6) percent per annum, and with a due date of January 2, 1999. See, Exhibit 3, Schedule C, at p. 6; Tr. at 176-179. According to Askegard, the gross appraised value of the Promissory

[3]We recognize that Patterson also testified that she had first worked for the IRS in 1993 -- well after the Estate fell into default -- and we concluded, upon the Defendants' objection, that Patterson had no foundation to address specific monitoring procedures before 1993. See, Tr. at 100, and 104. Nevertheless, the testimony in question was elicited without objection, although we weigh the evidence in accordance with its foundational flaws.

Note was $90,450.00, as the rest of the real property, which was exchanged for the Note, was a gift from his mother. Tr. at 178; see also, Exhibit 3, Schedule C, at p. 6. Neither Askegard, nor his wife, made any payments on that Note, which was dated August 6, 1979. Id. According to the Record before us, shortly thereafter, Askegard sold the property to another, which resulted in a recomputation of the Estate tax, but which did not result in any additional income to the Estate. See, Exhibit 2, Form 886-A, at p. 5.

8. Another Promissory Note was held by the Estate, which was executed on September 27, 1979, by the Defendant Wayne Aslesen ("Aslesen"), who is another son of Gladys. The Note was in the principal amount of $110,000.00, with interest at six (6) percent per annum, and with a due date of October 1, 1998. See Exhibit 3, Schedule C, at p. 6; Tr. at 178-79. As was the case with Askegard's Promissory Note, Aslesen's Note held a gross appraised value of $67,500.00, as the remainder of its value was treated as a gift from his mother. Id. At no time did Aslesen pay any amount to either his mother, or the Estate, on that Promissory Note. Tr. at 194-95.

9. On or about June 7, 1983, as the Personal Representative of the Estate, Askegard conveyed title to portions of Lot 2, in Wilkin County, to his brother, the Defendant David Askegard. See, Exhibit 12. David Askegard paid no money to the

Estate in exchange for the transfer of title to that land. Tr. at 197. The same property had been mortgaged to the Federal Land Bank which, in 1985, commenced a foreclosure action on that property. Tr. at 198. The foreclosure action did not come to the attention of the IRS, by virtue of any disclosure by Askegard, until December of 1992. See Exhibit 10, at PO142. Even at that late date, the most that Askegard could relate to the IRS Revenue Officer, Richard Wallin ("Wallin"), is that the "parcel had a mortgage (amount owed to the Federal Land Bank of Fergus Falls) of $71,999.75 at the time of death of the decedent and this amount, plus accrued interest, was assumed by David Askegard at the time of transfer," and that "[i]t has been brought to the attention of the estate that this property **may have been** lost by the recipient in a foreclosure action against David Askegard by the Federal Land Bank of Fergus Falls." Id. [emphasis added]. There is no evidence, both competent and credible, that the IRS was informed of that foreclosure prior to late 1991, or early 1992.[4]

---

[4]The Defendants attempt to impute knowledge of the foreclosure of Lot 2 to the IRS as of February of 1990, based upon a report, by Rebecca Holand ("Holand"), as an Estate and Gift Tax Attorney who is employed by the IRS at the offices in Brooklyn Center, Minnesota. Tr. at 136-37. In their Post-Trial Reply Brief, the Defendants go to great lengths in order to attribute knowledge of Lot 2's foreclosure

(continued...)

10. On June 10, 1983, Askegard conveyed another parcel of property, namely the "Northwest Quarter of Southwest Quarter (NW¼SW¼) Section 17, Township 137, Range 48, Clay County, Minnesota," to Aslesen for a total consideration of "$1,000.00 or less." Exhibit 14; see also, Exhibit 1, Schedule A, Item 9; Exhibit 10 at PO149. There does not appear to be any payment to the Estate for the conveyance of that parcel of land.

11. On July 26, 1983, Askegard transferred title to Item/Parcel 8[5] to the Defendant Aileen Askegard Clough ("Clough"), who is his sister, for no consideration, though the property was listed, on the Estate's Tax Return, as having a fair market

[4](...continued)
to the IRS, based upon the recitations of Holand's Report of Additional Estate Tax Examination, which was admitted as Exhibit 41. While the Defendants advanced an inventive effort, it is founded upon advocacy, and not upon fact, as Holand testified that she prepared that report probably in "late 1991 or early 1992," see Tr. at 170, after she either telephoned, to Wilkin County -- where the property was situated -- or did "something" else. Id. In any event, Holand testified that she did not know whether the property was sold or not; she only knew "that it was gone from the estate or the heirs." Id. We find no evidence that the IRS was aware of a disposition of Lot 2, by David Askegard, until late 1991, or early 1992, and we find persuasive the representation of Askegard, as the Personal Representative of the Estate, that he did not report the disposition of Lot 2, to the IRS, until December of 1992. Tr. at 182.

[5]On the Estate's Tax Return, see Exhibit 1, Item/Parcel 8 on Schedule A (Real Estate) is described as follows: "SW ¼ of Section 16, Township 137, Range 48, Clay County, Minnesta [sic]. (152.88 acres) Fair Market Value $191,100." See also, Exhibit 13.

value of $191,000.00. See, Exhibit 13; see also, Exhibit 1, Schedule A, Parcel 8. Clough never paid any money to the Estate in exchange for Item/Parcel 8. See, Tr. at 204. On November 10, 1998, Clough executed a Quit Claim Deed, which transferred her interest in Item/Parcel 8 to the Clough Family Trust, of which she is a Co-Trustee. See, Exhibit 15; Tr. at 204-05. The Clough Family Trust has leased Item/Parcel 8 to Clough's cousins -- Edwin, Thomas and Andrew Askegard -- who presently farm the property and make lease payments to the Family Trust. Those payments have not been redirected so as to pay the Estate's tax liability. Tr. at 206-07.

12. With respect to Lots 2, 10 and 11, which were pledged as security for the deferred payments, and for the special use valuation, see Finding No. 4, supra, Lot 2 was the property conveyed to David Askegard in June of 1983 for no consideration, and foreclosed upon by the Federal Land Bank. Neither Askegard, nor David Askegard, reported the foreclosure to the IRS before December of 1992.[6] As for Lots

[6]David Askegard testified that, at some unknown date, he received papers from the IRS about the disposition of Lot 2, but he has never produced those papers, and did not have them with him at the time of Trial. Tr. at 198. He acknowledged, however, that he did not send those papers "anywhere." Tr. at 199. He could not recall Askegard ever asking him about the property, or what happened to it. Id. On this Record, we find that neither David Askegard, nor Askegard, informed the IRS about the foreclosure of Lot 2, in 1985, see Tr. at 198, or at any other time, until December (continued...)

10 and 11, those parcels were subject to a foreclosure action, which was commenced by the Federal Land Bank of Fergus Falls, in June of 1988. See, Exhibit 31. The IRS was made a party to that action, because a Notice of Federal Estate Tax Lien was recorded on that property on March 30, 1984, but apparently, the IRS's lien was inferior to the lien of the Federal Land Bank. Id. at 000228, para. V; see also, Exhibits 17 and 32. On July 20, 1988, the IRS disclaimed any interest in that property, Exhibit 31 at 000238, apparently due to the insufficiency of equity to cover the IRS's interest. See, Exhibit 38.

According to the Record presented, the property was sold on February 7, 1989, but subject to a one year period of redemption. See, Exhibit 31 at 000266-67. On or about February 5, 1990, Askegard proposed that the IRS release its recorded liens on the described property, in favor of substituted security in the form of cash. See, Exhibit 19 at pp. 4-6. Since the IRS could obtain some limited amount of recovery, by a release of the Liens, that would have been lost absent a redemption of the property by "family members," as that phrase is defined in the Internal Revenue Code, id., the IRS agreed to Askegard's proposal, and he redeemed the property, and resold

[6](...continued)
of 1992.

the same to Andrew and Edwin Askegard for $409,000.00. See, Exhibits 36 and 39. The net proceeds from that sale -- $38,459.71 -- were escrowed, subject to the IRS's lien. See, Exhibit 39 at p. 5. The IRS's liens were released, on Lots 10 and 11, pursuant to the agreement reached on February 5, 1990. See, Exhibit 19, Letter Agreement of February 5, 1990, at p. 2.

Subsequently, a dispute arose between the parties as to whether an additional Estate Tax should be due from the Defendants, owing to the recapture of the fair market value of Lots 10 and 11. As of the date of the Trial, that dispute continues but, since it involves considerations irrelevant, and immaterial, to the issues tried, and particularly the Defendants' singular defense to the Government's claim -- namely, that the Government's action is time-barred -- we follow the parties' lead and do not address that dispute further.[7]

[7]Exhibits 40 and 41 summarize the parties' respective positions as to the "recapture" issue. At least as we understand the dispute, the IRS concedes that Edwin and Andrew Askegard were qualified heirs, such that the transfer of Lots 10 and 11 to them, in February of 1990, would ordinarily not result in an additional tax liability to the heirs of the Estate, except for the fact that Edwin and Andrew Askegard refused "to provide written consent to personal liability for additional estate tax in the event of early disposition or early cessation of qualified use with respect to the subject property, (as required by IRC section 2032A(d)(2)), [which] render[ed] the property ineligible for continued special use valuation." Exhibit 41, at P0191, citing Revenue (continued...)

13. With respect to the Estate's payments to the IRS, the Estate timely paid the first few annual installment interest payments, for the years 1982, 1983, and 1984, to the IRS. Tr. at 88; Exhibit 5, at p. 5. No payment was made for November of 1985, but a payment was received late, on January 30, 1986. Tr. at 89-90; Exhibit 5, at p. 5; Exhibit 16, at p. 2. In response to a letter from the IRS dated February 12, 1986, Askegard filed an Application for an extension of time to pay Estate Tax until November 6, 1986, due to the Estate's cash flow difficulties, and the need for Askegard to convert assets into cash. See, Exhibit 26, at pp. 1 and 2. On October 29, 1986, the Estate sought, and received, an extension to pay Estate Tax until November 1, 1987. Id. at pp. 3 and 4. Subsequently, on August 21, 1987, the Estate obtained a further extension to pay Estate Tax until November of 1988. Id. at p. 5. Thereafter, in November of 1988, the Estate made a payment, in the amount of $20,000.00, to the IRS. See, Exhibit 5, at p. 6; Exhibit 16, at p. 2. On September 30, 1989, the Estate sought, and obtained, an extension to pay Estate Tax until November

[7](...continued)
Ruling 85-66. The Defendants take exception to that contention, arguing that "Section 2032A does not require such an agreement on the part of the transferees and the District Office cannot unilaterally impose such a requirement." Exhibit 40, at P00078. Since the issue is not properly before us, we express no view as to who has the better argument.

1, 1990. See, Exhibit 26 at p. 6. Thereafter, on February 25, 1991, the Estate paid the IRS $15,000.00. See, Exhibit 5, at p. 6; Exhibit 16, at p. 3.

14. According to the Record presented, the IRS first imposed a penalty, owing to a late payment of interest, on February 11, 1991, which reflects that the IRS's default process had commenced. See, Tr. at 126; see also, Exhibit 5, at p. 6; Exhibit 6, at p. 3. The Estate's payment of $15,000.00, on February 25, 1991, was insufficient to cure the deficiencies which had accrued to that date, and the Record reveals that no further extensions for the payment of Estate Tax were approved for the Estate after November 1, 1990. The IRS assessed another late payment penalty on May 13, 1991. Thereafter, on August 30, 1991, a notice and demand was transmitted to the Estate which advised that the entire amount of Estate Tax was due and payable. Tr. at 122.

Subsequently, on September 4 or 9, 1990, the IRS transmitted a billing, which totaled $257,744.37, in taxes due, interest owing, and a nonpayment penalty, to Askegard as the Personal Representative of the Estate. See, Exhibit 6, at p. 2. The billing disclosed that the Estate's account was "defaulted due to nonpayment." Id. It is not disputed that Exhibit 6 is the only "hard-copy" of any notice forwarded to Askegard by the IRS. As a consequence, the history of the Estate's account is

established by the computer records which have been maintained by the IRS, as the notices, apparently, were not saved in hard copy, prior to 1996. See, Tr. at 123-24. However, there has been no objection to the foundation for the IRS's records, inclusive of its computer printouts, and we are persuaded, on this Record, that the computer printouts are an accurate reflection of the history of the Estate's account.[8] While challenging the timeliness of this action on other grounds, which we shall subsequently address, the Defendants do not expressly challenge the default date of

[8]This case amply demonstrates the hurdles in proof that must be surmounted in cases controlled by lengthy statutes of limitations. Here, Gladys passed away in 1981, and the action was not commenced until 2001 -- over twenty years later. Some witnesses were unavailable, and documents, previously contained in the IRS's files, had been destroyed though file management procedures which, we understand, have now been amended. The Defendants have not suggested, nor proven, spoliation, and we are satisfied, through the testimony of a number of the Government's witnesses, that the history of the Estate's account, and the official acts taken by the IRS as to that account, are competent and reliable. The witnesses had substantial, personal experience, in reviewing like documents, including the computer printouts, and we find their testimony credible. We understand that a "presumption of regularity supports the official acts of public officers and, in the absence of clear evidence to the contrary, courts presume that they have properly discharged their official duties." United States v. Ahrens, 530 F.2d 781, 785 (8th Cir. 1976), citing United States v. Chemical Foundation, Inc., 272 U.S. 1, 14-15 (1926). Over and above that presumption, we are persuaded, based on this Record, that the official acts of the IRS had the requisite regularity.

August 30, 1991, which has been properly established in this Record, and we adopt that default date as our own. See, e.g., Tr. at 52.

15. The IRS's collection efforts resulted in a levy, in February of 1995, of the Estate's account at the Norwest Bank in Fargo, Minnesota, which recouped approximately $50,000.00. Wallin, who was pursuing the collection effort, determined that the Estate was unable to repay its Estate Tax obligations, and no other Estate assets were located, except for the previously referenced transfer of the Estate's real property to Clough, which was transferred, in turn, to the Clough Family Trust, by Quitclaim Deed.

16. Contrary to the Defendants' position, we find that, as of either February 7, 1989, or February 5, 1990, the Estate had not disposed of one-third of its closely-held business assets, and therefore, the applicable ten (10) year statute of limitations did not begin to run at that time. Rather, we find that the statute of limitations did not commence to run until August 30, 1991, when a notice and demand was transmitted to the Estate. As a result, the statute of limitations had not expired by May 16, 2001, when this action was commenced.

17. The attached Memorandum is expressly made a part of these Findings of Fact, insofar as the Memorandum contains factual findings.

## III. Conclusions of Law

1. The Court has jurisdiction over the subject matter of this action pursuant to Title 28 U.S.C. §§1340, and 1345, as well as under Title 26 U.S.C. §§7402(a), and 7403. Personal jurisdiction over each of the named Defendants is proper, and the venue of this Court is appropriate by virtue of Title 28 U.S.C. §1396.

2. The parties concede, and this Court agrees, that the ten (10) year statute of limitations, which is prescribed by Title 26 U.S.C. §6502(a), applies to the Government's action. See, e.g., United States v. First Midwest Bank/Illinois, N.A., 1997 WL 675192 at *8 (N.D. Ill., October 28, 1997), citing United States v. Wright, 57 F.3d 561, 562 (7th Cir. 1995). Under the governing law, and in view of the Record presented, two different provisions can cause an Estate, which has elected to defer the payment of taxes, pursuant to Title 26 U.S.C. §6166, to lose the deferral of estate taxes. Title 26 U.S.C. §6166(g)(1)(A)(i) provides, in pertinent part, as follows:

> If one-third or more in value of an interest in a closely held business which qualifies under subsection (a)(1) is distributed, sold, exchanged, or otherwise disposed of, * * * then the extension of time for payment of tax provided in subsection (a) shall cease to apply, and any unpaid portion of the tax payable in installments shall be paid upon notice and demand from the Secretary.

This is the provision which, according to the Defendants' view of the case, triggered the running of the statute of limitations either on February 7, 1989, or February 5, 1990.

In turn, Section 6166(g)(3) provides, in relevant part, as follows:

> If any installment under this section is not paid on or before the date fixed for its payment by this section (including any extension of time for the payment of such installment), the unpaid portion of the tax payable in installments shall be paid upon notice and demand from the Secretary.

The Government urges, and we have found, that the notice and demand for default against the Estate was effected on August 30, 1991, and we conclude that the applicable statute of limitations should run from that date.

3. On this Record, we further conclude that, by commencing this action on May 16, 2001, which was within the applicable ten (10) year period prescribed by Title 26 U.S.C. §6502(a), the Government's Complaint was not time-barred.

4. The Defendants assert no other defense to the Government's causes of action, and therefore, we conclude that the Government is entitled to an entry of Judgment in its favor. See, Tr. at 10 and 15 (memorializing defense counsel's representation that the Defendants have no defense other than the statute of limitations). Indeed, but for the statute of limitations defense, which required factual

findings, the Defendants have conceded that they have effectively admitted the allegations of the pleadings. See, Tr. at 15. As a result, in the absence of a meritorious statute of limitations defense, the Defendants concede Askegard's liability, as the Personal Representative of the Estate, under Title 31 U.S.C. §3713(b).[9] See, Tr. at 15. We cannot, however, enter a Judgment at this time, as there may well be a

---

[9]Title 31 U.S.C. §3713(b) provides, in relevant part, as follows:

> A representative of a person or an estate * * * paying any part of a debt of the person or estate before paying a claim of the Government is liable to the extent of the payment for unpaid claims of the Government."

Even in the absence of the Defendants' stipulation, we would find, on the basis of this Record, and conclude as a matter of law, that Askegard should be held liable for the Estate's unpaid Estate Tax liabilities. See, United States v. Bartlett, 186 F. Supp.2d 875, 885 (C.D. Ill. 2002), citing United States v. First Midwest Bank/ Illinois, N.A., 1997 WL 675192 at *13 (N.D. Ill., October 28, 1997)(defining the elements of proof under Section 3713(b)). Moreover, "[t]he burden lies with those who argue that the government's priority does not apply to show that they are not within the provisions of section 3713." United States v. Cole, 733 F.2d 651, 654 (9th Cir. 1984), citing Bramwell v. United States Fidelity & Guaranty Co., 269 U.S. 483, 487 (1926).

Here, the Record is bereft of any explanation, and Askegard testified at Trial, so he plainly had the opportunity of presenting one, as to why he divested the Estate of so many valuable assets to the detriment of the Estate's tax liability to the United States Government. Notably, at all relevant times, Askegard, and the Estate, appear to have been represented by legal counsel. Accordingly, any Judgment to be entered will include an adjudication of Askegard's liability under Section 3713(b).

dispute as to the amount of taxes, interest, and penalties, which are owed to the Government, and appropriate language, so as to effectuate the foreclosure on the real property which currently is being held by the Clough Family Trust, must be secured.[10]

5. The attached Memorandum is expressly made a part of these Conclusions of Law, insofar as the Memorandum contains legal conclusions.

## IV. Order

1. That, given the foregoing Findings of Fact and Conclusions of Law, the Court directs that Judgment be entered in favor of the Plaintiff United States of America, but stays the entry of Judgment until, following a Hearing with counsel for the parties, the language of the Judgment can be addressed.

2. That counsel are directed to confer, forthwith, in an effort to reach a stipulated proposed Judgment and, if agreement is not reached, then counsel shall transmit to the court, and serve upon opposing counsel, their respective proposals for a final Judgment **by no later than January 19, 2005**.

BY THE COURT:

[10] At the outset of the Trial, an effort to stipulate to the amounts, which would be owed if the statute of limitations defense were rejected, proved to be unsuccessful. See, Tr. at 15-17.

Dated: January 6, 2005

s/Raymond L. Erickson
Raymond L. Erickson
UNITED STATES MAGISTRATE JUDGE

## M E M O R A N D U M

The Defendants' statute of limitations defense is singularly predicated on their contention that, by no later than February 5, 1990, the IRS was aware that one-third or more of the Estate's interest in a closely-held business had been "distributed, sold, exchanged, or otherwise disposed of," Title 26 U.S.C. §6166(g)(1)(A)(i), such that "the extension of time for payment of tax provided in subsection (a) * * * cease[d] to apply, and any unpaid portion of the tax payable in installments [was to] be paid upon notice and demand from the Secretary." Id. To reach that result, however, the Defendants impute to the Government knowledge concerning the foreclosure sale, as to Lot 2, which occurred in 1985. In contrast, the Government characterizes that foreclosure as a "secret sale." See, e.g., United States' Post-Trial Brief, at p. 4.

There appears to be no dispute that, given the interaction between Askegard, and representatives of the IRS from the District Director's office, in St. Paul, Minnesota, which resulted in the letter agreement of February 5, 1990, see Exhibit 19,

the Government was well aware that the Estate was disposing of Lots 10 and 11, because the Government was agreeing to release the Liens, under both Section 6166, and Section 2032A, or else its equity in the property would be totally lost. Accordingly, we have no hesitation in finding that, as of February 5, 1990,[11] the Government knew that Lots 10 and 11 would be redeemed by the Estate in order to be sold to Edwin and Andrew Askegard. As we have found, the agreed value of Lot 10 was $155,812.00, while the agreed value of Lot 11 was $160,184.00, for a composite value of $315,996.00. See, Finding No. 5, supra. Since the total value of the Estate's closely-held business was $999,918.00, the sale of Lots 10 and 11

[11]The Defendants push the envelope too far in urging that, as early as February 8, 1989, the Government was aware of the foreclosure sale, on Lots 10 and 11, which resulted in their purchase by a third-party. Though the statement is true, it is also true that the purchase was subject to a redemption period which extended to February 7, 1990, during which the Estate could reacquire Lots 10 and 11. See, Defendants' Post-Trial Brief, at p. 3, n. 3. In both practical, and legal effect, no disposition of property occurred on February 8, 1989, as the Estate's right to reacquire the property, within the ensuing year, had not been surrendered. In any event, we agree with the Defendants that, whether the disposition occurred on February 8, 1989, or February 7, 1990, is irrelevant because either date was more than ten (10) years before the Government's commencement of this action on May 16, 2001.

comprised only 31.6% of the Estate's interest in the closely-held business, and not the requisite 33.3%.[12]

In order to surmount the 33.3% threshold, which is established by Section 6166(g)(1)(A)(i), the Defendants encourage us to find that the value of the remaining Lot -- Lot 2 -- should be included in the percentage calculation. On this Record, we are unable to make such a finding. While we can acknowledge that there are some anomalies in this Record, they do not afford us an opportunity to either speculate, or surmise. For example, the Record is plain, that the Government secured a lien on Lot 2, see Exhibit 17, and yet, there is no showing that, when the Federal Land Bank of Fergus Falls foreclosed on that Lot, in 1985, the Government had been made a party

[12]For these purposes, we presume that all of Lots 10 and 11 were sold on or about February 5, 1990, even though the Record discloses that less than complete Lots -- we do not precisely know how much less -- were sold. See, United States' Post-Trial Brief, at p. 5, n. 11; Tr. at 184. We further note that, in view of less than full Lots having been sold, the Defendants have failed in their burden, as to this aspect of their affirmative statute of limitations defense, since they have proffered no valuation for the less than full Lots. However, following a conservative approach, we presume that full Lots were sold.

Similarly, we have no need to address the Government's intriguing argument that the valuation equation must be in 1990 dollars, and that the Defendants have failed to proffer, much less prove, those valuations. Notably, the Government offers no persuasive authority for the argument raised and, since it is extraneous to the result we reach, we do not consider the argument further.

to that proceeding, or was otherwise aware that foreclosure was afoot. Indeed, Askegard testified at Trial that, even when he reported that Lot, in December of 1992, as "may" having been the subject of a foreclosure, he was not exactly sure, see Tr. at 182, and that he never previously reported that property as having been the subject of a disposition outside of the immediate family. Id.

In sum, the simple fact is that the Record presented does not demonstrate any knowledge by the Government, on or about February 5, 1990, that Lot 2 had been transferred outside the heirs of the Estate. No Court documents, which relate to that foreclosure, nor any other evidence, ties the Government to that foreclosure, or any knowledge of the same. As we have previously related, however, we recognize the Defendants' argument that Holand prepared a report, relating to the letter agreement of February 5, 1990, which addressed whether a recapture tax should be imposed, apparently upon Clough, owing to the failure of Edwin and Andrew Askegard to sign a form of acceptance of liability, see Exhibit 41, which expressly addresses Lot 2 as follows:

> On June 7, 1983 parcel A-2, located in Wilkin County, Minnesota, was distributed to qualified heir David

> Askegard. On July 8, 1983[13] this same parcel was forclosed [sic] upon by the Federal Land Bank. The Federal Land Bank bid $178,692 for N½ (S) 136-46 and David Askegard's right of redemption expired unexercised on July 8, 1984.

Id. at P0188.

While the Defendants attempt to spin the report into an awareness, by the IRS, of the foreclosure on Lot 2, in either 1983, or 1985, as of the time of the letter agreement of February 5, 1990, Holand testified that she had prepared the report in either late 1991, or early 1992. Tr. at 170. Ten years after either late 1991, or early 1992, would allow this action, which was commenced prior to late 2001, or early 2002, to proceed without violence to the applicable statute of limitations.[14]

---

[13]The testimony of David Askegard reflected that the foreclosure of the Federal Land Bank was in 1985, while Holand identifies the foreclosure as occurring about one month after the transfer of the land to David Askegard. We are unable to determine, on this Record, whose historic recounting is accurate, but Holand's recitation could explain why the Government was not drawn into the foreclosure action as a defendant, or otherwise provided notice of the foreclosure, since the Notice of Federal Estate Tax Lien, as to Lot 2, was not executed until March 26, 1984. If Holand's recounting is accurate, then the Government's Lien on Lot 2 might not have been recordable as the land had already transferred, nearly a year before the Lien was signed by an IRS representative.

[14]Relying upon Lakeshore National Bank v. Coyle, 419 F.2d 958 (7th Cir. 1969), the Defendants advocate the "automatic acceleration" of the deferred Section 6166 payments, so as to read the "notice and demand" prerequisite to a collection action out of Section 6166(g). The Government disputes that reading. In view of the fact (continued...)

Nor can we conjecture that, as of the letter agreement of February 5, 1990, the Government should have known that something was awry, and should have made a more intensive inquiry, so as to ascertain whether more than one-third of the Estate's interest in the closely-held business had been transferred to others. Much of the effort, in February of 1990, was to ensure that the land could be transferred to Edwin and Andrew Askegard without affecting the status of the special valuation, under Section 2032A, through the release of the Federal Estate Tax Liens which would allow a mortgage for the property to be secured. Nothing in Holand's report, or in any witness's testimony, so much as suggests that any party inquired into the Section 6166(g)(1)(A)(i) question, or that Askegard, or his attorneys, inquired as to whether the Estate would be subject to any acceleration of deferred tax payments because of the sale to Askegard's cousins.

Perhaps, with 20/20 hindsight, such an inquiry might seem logical, but we cannot overlook that, at the time, the Estate had been granted an extension in which to make its installment interest payments, until November of 1990 -- some nine (9)

[14](...continued)
that either "late 1991" or "early 1992" predates the filing of this law suit by over ten (10) years, we need not resolve the "automatic acceleration" dispute.

months later. Notwithstanding the Defendants' emphasis, now, that the IRS was not aggressively pursuing Askegard's annual certifications, he or his legal representatives were aware of the need to secure extensions, which they routinely obtained, through November of 1990, without so much as suggesting what he, and his fellow heirs, were doing with the Estate's assets. On this Record, we cannot reasonably infer that the circumstances were such as to put the Government on actual or imputed notice that more than one-third of the Estate's interest in the closely-held business was in jeopardy of being sold, or transferred. In fact, given Askegard's lack of knowledge concerning the foreclosure on Lot 2, such an inquiry of him -- the person charged with self-reporting such a transfer to the IRS -- would plainly have been unavailing. Accordingly, we have found, and concluded, that the Government's Complaint is not barred, as untimely, under Section 6166(g)(1)(A)(i).

Even though the timeliness of this action, under Section 6166(g)(3), is not seriously challenged by the Defendants, we find, and conclude, that the action is timely. As the Defendants concede, "[w]here an estate is granted an extension of time as provided * * * under the provisions of section 6166, for payment of any estate tax, the running of the period of limitations is suspended for the period of time for which the extension is granted." Defendants' Post-Trial Brief, at 6, quoting United States v.

First Midwest Bank/Illinois, N.A., supra at *9, quoting, in turn, 26 C.F.R. §301.6503(d)-1. Here, the IRS granted the Estate's requests for extensions through November of 1990. Thereafter, penalties were imposed for insufficient late payments and, ultimately, the Estate's account went into default, and a notice and demand was sent to the Estate on August 30, 1991. The IRS was not authorized to accelerate the payments, until after the service of the notice and demand, see Lake Shore Nat'l Bank v. Coyle, supra at 962, and here, the notice and demand was not unreasonably delayed. Therefore, the statute of limitations did not commence to run until August 30, 1991, and this action, when commenced on May 16, 2001, was timely.

R.L.E.